UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SCOTT MOREHOUSE,

Plaintiff,

v.

MARTIN VASQUEZ, *et al.*,

Defendants.

No. 17-CV-4836 (KMK)

OPINION & ORDER

Appearances:

Scott Morehouse
Fishkill, NY
*Pro se Plaintiff*

Adam J. Sansolo, Esq.
New York State Office of the Attorney General
New York, NY
*Counsel for Defendants Robert Reid, Jeffrey Greiner, and Erik Munro*

KENNETH M. KARAS, United States District Judge:

Pro se Plaintiff Scott Morehouse ("Plaintiff"), currently incarcerated at Southport

Correctional Facility, brings this Action, pursuant to 42 U.S.C. § 1983 and the Americans with

Disabilities Act ("ADA"), against Martin Vasquez ("Vasquez"), Jeffrey Greiner ("Greiner"),

Erik Munro ("Munro"), all Security Hospital Treatment Assistants ("SHTAs") at Mid-Hudson

Forensic Psychiatric Center ("MHFPC"), and Robert Reid ("Reid"), a registered nurse at

MHFPC (collectively, "Defendants"). (*See* Compl. (Dkt. No. 2).) Plaintiff claims that

Defendants violated his rights under the Eighth and Fourteenth Amendments and the ADA when

they assaulted him and failed to intervene in or treat him after these assaults. (*Id.* at 2, 5–6.)

Before the Court is a Motion for Summary Judgment (the "Motion") submitted by Greiner, Munro, and Reid (the "Moving Defendants"). (*See* Moving Defs.' Not. of Mot. ("Not. of Mot.") (Dkt. No. 91).) For the reasons explained herein, the Motion is granted in part and denied in part.

I. Background

A. Factual Background

The following facts are taken from Moving Defendants' statement pursuant to Local Civil Rule 56.1, (Moving Defs.' Local Rule 56.1 Statement ("Defs.' 56.1") (Dkt. No. 94)), the exhibits submitted by Moving Defendants, (Decl. of Robert Reid ("Reid Decl."); Decl. of Erik Munro ("Munro Decl."); Decl. of Jeffrey Greiner ("Greiner Decl."); Decl. of Edward Campbell ("Campbell Decl."); Decl. of Benjamin Chukwuocha, M.D. ("Chukwuocha Decl."); Decl. of Paul Hand ("Hand Decl."); Decl. of Lydia Harvey ("Harvey Decl."); Decl. of Vahan Kouyoumdjian, M.D. ("Kouyoumdjian Decl."); Decl. of Madelyn Malfa ("Malfa Decl."); Decl. of Tiffany McKenzie ("McKenzie Decl."); Decl. of Adam J. Sansolo, Esq. ("Sansolo Decl."); Decl. of Bindu Thomas ("Thomas Decl.") (Dkt. Nos. 95–106)), as well as Plaintiff's Complaint and deposition transcript, (Compl.; Sansolo Decl., Ex. A ("Pl.'s Dep. Tr.") (Dkt. No. 105-1)), and are recounted in the light most favorable to Plaintiff, the non-movant. *See Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018).[1] As only Moving Defendants have filed for

---

[1] Moving Defendants included as an exhibit certain excerpts from Plaintiff's deposition testimony. (*See* Pl.'s Dep. Tr.) At the request of the Court, counsel for Defendant Vasquez provided a full electronic version of this testimony on November 19, 2019. This version of the testimony is the one cited herein.

summary judgment, the Court will recount only those facts relevant to these Defendants.

Moving Defendants have sent the required Rule 56.2 Notice to Plaintiff. (*See* Dkt. No. 103.)[2]

---

[2] Local Civil Rule 56.1(a) requires the moving party to submit a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local Civ. R. 56.1(a). The nonmoving party must then submit "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short[,] and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." *Id.* at 56.1(b). "If the opposing party . . . fails to controvert a fact set forth in the movant's Rule 56.1 statement, that fact will be deemed admitted pursuant to the local rule." *Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) (citation and quotation marks omitted); *see also T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) (same). "A pro se litigant is not excused from this rule." *Brandever v. Port Imperial Ferry Corp.*, No. 13-CV-2813, 2014 WL 1053774, at *3 (S.D.N.Y. Mar. 13, 2014) (citation and italics omitted). Here, Moving Defendants filed and served their 56.1 Statement, (Defs.' 56.1), in addition to a statement notifying Plaintiff of the potential consequences of not responding to the Motion, as required by Local Rule 56.2, (Dkt. No. 100). Despite this notice, Plaintiff failed to submit a response to Moving Defendants' 56.1 Statement. Accordingly, the Court may conclude that the facts in Moving Defendants' 56.1 Statement are uncontested and admissible. *See Brandever*, 2014 WL 1053774, at *3 (concluding that because the pro se plaintiff did not submit a Rule 56.1 statement in response to the defendant's statement of facts, "there [were] no material issues of fact"); *Anand v. N.Y. State Div. of Hous. & Cmty. Renewal*, No. 11-CV-9616, 2013 WL 4757837, at *7 (S.D.N.Y. Aug. 29, 2013) (same).

Nevertheless, in light of the "special solicitude" afforded to pro se litigants "when confronted with motions for summary judgment," *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988), the Court will "in its discretion opt to conduct an assiduous review of the record," when deciding the instant Motion, *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and quotation marks omitted); *see also Houston v. Teamsters Local 210, Affiliated Health & Ins. Fund-Vacation Fringe Ben. Fund*, 27 F. Supp. 3d 346, 349 (E.D.N.Y. 2014) ("Although [the] plaintiffs did not file a Rule 56.1 statement, the Court has independently reviewed the record to ensure that there is uncontroverted evidence to support the paragraphs referenced in [the] defendants' Rule 56.1."); *Pagan v. Corr. Med. Servs.*, No. 11-CV-1357, 2013 WL 5425587, at *2 (S.D.N.Y. Sept. 27, 2013) (explaining that "[t]he [c]ourt ha[d] considered the [motions for summary judgment] in light of the entirety of the record to afford [the pro se] [p]laintiff the special solicitude to which he [was] entitled" where the plaintiff failed to submit a Rule 56.1 response (citation omitted)); *Cherry v. Byram Hills Cent. Sch. Dist.*, No. 11-CV-3872, 2013 WL 2922483, at *1 (S.D.N.Y. June 14, 2013) ("[W]here a pro se plaintiff fails to submit a proper . . . Rule 56.1 statement in opposition to a summary judgment motion, the [c]ourt retains some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions." (italics and quotation marks omitted)). The Court will therefore consider whether any facts in the record or in Plaintiff's Complaint contradict Moving Defendants' 56.1 Statement.

### 1. The Parties

During the relevant time period, Plaintiff was committed to MHFPC for evaluation after he pled not responsible for reason of mental disease or defect to certain criminal charges under New York State law. (Defs.' 56.1 ¶ 5 (citing Chukwuocha Decl. ¶ 13; *id.* Ex. A ("Discharge Summ."), at 1 (Dkt. No. 99-1)); Pl.'s Dep. Tr. 28.) MHFPC is an "accredited adult psychiatric hospital" that provides ambulatory and in-patient medical services to "seriously and persistently mentally ill patients" who MHFPC "receives . . . pursuant to various provisions of the New York State Criminal Procedural Law." (Defs.' 56.1 ¶¶ 16–17 (citing Chukwuocha Decl. ¶¶ 3–4).)

Defendant Munro is a Senior SHTA at MHFPC. (*Id.* ¶ 12 (citing Munro Decl. ¶ 2); Pl.'s Dep. Tr. 53.) As a Senior SHTA, Munro supervises the SHTA Department in the building to which he is assigned and is "responsible for the safety and security of the SHTA staff[,] as well as the patients at [MHFPC]." (Defs.' 56.1 ¶ 14 (citing Munro Decl. ¶ 2).) Munro's responsibilities include de-escalating situations through the use of verbal techniques and, as a last resort, "approved physical intervention techniques." (*Id.* ¶ 15 (citing Munro Decl. ¶ 2).) Defendant Greiner is an SHTA at MHFPC. (*Id.* ¶ 10 (citing Greiner Decl. ¶ 2).) His responsibilities are similar to those of Munro. (*Id.* ¶ 11 (citing Greiner Decl. ¶ 2).) Defendant Reid works as a Registered Nurse ("RN") at MHFPC. (*Id.* ¶ 7 (citing Reid Decl. ¶ 2); Pl.'s Dep. Tr. 61.) As an RN, Reid cares for and treats MHFPC patients and is responsible for administering daily medications, taking daily vital signs, and assisting patients with dressing, grooming, and other daily activities. (Defs.' 56.1 ¶¶ 8–9 (citing Reid Decl. ¶ 2).)

## 2. Plaintiff's MHFPC Hospitalization

Plaintiff was hospitalized at MHFPC from December 15, 2015 to September 30, 2016. (*Id.* ¶ 6 (citing Chukwuocha Decl. ¶ 13); Pl.'s Dep. Tr. 29–30.)[3] ████████████ (Defs.' 56.1 ¶ 21 (citing Chukwuocha Decl. ¶ 15; Reid Decl. ¶ 4)), ████████████ ████ █████████████████████████████████████████████████ ██████" (*id.* ¶ 20 (citing Chukwuocha Decl. ¶ 14; Discharge Summ.); Pl.'s Dep. Tr. 159). Plaintiff was subsequently diagnosed at MHFPC with ████████████████ ██████████████████████████ (Discharge Summ. 1.) During Plaintiff's hospitalization, he "engaged in multiple [planned or impulsive] incidents of aggression" with both peers and staff, including approximately "fifty physical alterations with staff." (Defs.' 56.1 ¶¶ 22–23 (citing Chukwuocha Decl. ¶ 17; Discharge Summ. 1; Pl.'s Dep. Tr. 64).) According to Moving Defendants, Plaintiff "never once considered himself the aggressor." (*Id.* ¶ 24 (citing Pl. Dep. Tr. 64).)[4] ████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████ (Chukwuocha Decl. ¶ 16.)

---

[3] Although Plaintiff could not remember the exact date he arrived at MHFPC during his deposition, he agreed that he arrived "in and around December 2015" and was discharged on September 30, 2016. (Pl.'s Dep. Tr. 29–30.)

[4] Plaintiff estimates that during his time at MHFPC, he was in "more than maybe [50]" physical altercations with staff members. (Pl.'s Dep. Tr. 64.) He did not consider himself to have been the "aggressor" for any of these altercations because he "was[] [not] threatening to hurt [any]body." (*Id.* at 64–65.) He recalled having between five and ten physical altercations with other patients. (*Id.* at 70.) Prior to May 7, 2016, Plaintiff testified that he did not have any physical altercations with Reid, Munro, and Greiner. (*Id.* at 72–76.) According to Plaintiff, he had had "several" other physical altercations with Vasquez. (*Id.* at 77–78.)

### 3. Plaintiff's Recitation of the Facts

#### a. May 7, 2016 Incidents

On May 7, 2016, Plaintiff "had a confrontation with a patient" who approached Plaintiff and another patient with whom Plaintiff was sitting. (Pl.'s Dep. Tr. 82.)[5] The instigating patient was on "special watch" and had been a "physical problem" with MHFPC staff and patients. (*Id.*) Plaintiff "defended [him]self and the other patient" by hitting the instigating patient. (*Id.* at 82, 173, 183.) He also "jabbed" the patient with whom he was sitting in the corner of the eye during the altercation. (*Id.* at 184.) Plaintiff did not suffer any injuries because the instigating patient never actually touched him. (*Id.* at 173.)[6] MHFPC staff brought Plaintiff into the "side room" to calm him down after the altercation, and at least one staff member was with him while he was in the room. (*Id.* at 87–88.) Although the staff members who were with Plaintiff switched places, Vasquez was usually the one who was present. (*Id.* at 88–89.)

At some point, MHFPC staff allowed Plaintiff to return to the "day area," but then informed him that he would be moved to a different ward until the next day. (*Id.* at 82–83, 90.) Plaintiff refused to move. (*Id.* at 83.) Because he would not move willingly, Plaintiff was put back in the side room and told, "[I]f you don't go up[,] . . . we'll use force and take you up there." (*Id.* at 90.) Plaintiff responded that he would defend himself. (*Id.*) When MHFPC members moved toward Plaintiff to put him on a gurney, Plaintiff pulled away and "grabbed one of the staff member's arm[s] . . ., put him in an arm lock[,] and push[ed] him away." (*Id.* at 89.) Plaintiff thinks that this staff member may have been Vasquez. (*Id.* at 90–91.) Plaintiff recalls

---

[5] Plaintiff did not share the other patient's name during his deposition in order "[t]o protect [the patient's] HIPAA rights." (Pl.'s Dep. Tr. 86.)

[6] Plaintiff thought that he may have also had an incident with the same patient on the previous day, but then said that he likely did not. (Pl.'s Dep. Tr. 174.)

that there was a "confrontation" or "scuffle," ███████████████████████ ███████████████ when MHFPC staff "got [him] down on the ground." (*Id.* at 89–91.) Plaintiff testified that at least Greiner and Vasquez picked him up and placed him on the gurney and is "sure [that] [Munro] was [also] involved." (*Id.* at 92.)

Once on the gurney, Plaintiff was restrained with three or four "canvas[-]type belts" that were "strapped down across [his] chest, . . . upper chest, . . . stomach[,] . . . thighs[,] and . . . ankles," and he was unable to sit up very far. (*Id.* at 84, 93.) Vasquez, Greiner, Reid, and Munro then brought Plaintiff to the elevator. (*Id.* at 84.) Prior to getting on the elevator, a "little bit of force" was used by Defendants. (*Id.*) Plaintiff thought this was because Defendants knew that there were cameras on the ward. (*Id.*) On the way to the elevator, Munro said something along the lines of "you haven't seen trouble yet." (*Id.* at 95.) Plaintiff "really didn't fight [Defendants] at that point." (*Id.* at 84.) Defendants then wheeled the gurney onto the elevator, which they needed to take one or two floors up. (*Id.* at 94, 182.)[7] During the ride, Plaintiff's feet were positioned toward the door. (*Id.* at 94.) Reid stood by Plaintiff's left foot in the corner between the elevator control panel and the wall, Munro stood on Plaintiff's left side, Greiner stood above Plaintiff, and Vasquez stood to his right. (*Id.* at 94–95, 99.) "[A]s soon as the elevator door shut," Plaintiff believes that Munro "hit the stop button," and Defendants "took turns on [him]" in a "coordinated attack." (*Id.* at 84, 96, 100.)

Vasquez was the first Defendant to make contact with Plaintiff, when he "stepped over, leaned in [Plaintiff's] face[,] and spit right in [his] face." (*Id.* at 96.) Vasquez then "started hitting [Plaintiff] in various parts of [his] body" with closed fists. (*Id.* at 96–97.) Vasquez hit

---

[7] According to Plaintiff, the elevator ride took place in the late afternoon or early evening. (Pl.'s Dep. Tr. 81.)

Plaintiff "four or five times" in each of his chest, stomach, and groin. (*Id.* at 97.) While Vasquez hit Plaintiff, Munro "grabbed [Plaintiff's] left leg and twisted [his] ankle." (*Id.* at 98.) Munro then smacked Plaintiff on both sides of his face multiple times with an open hand and punched him in the face, stomach, and groin with a closed fist. (*Id.* at 98–99.) According to Plaintiff, Munro hit him between ten and 50 times in the stomach and between ten and 20 times in the groin. (*Id.* at 100.) Although Greiner "didn't do as much as the other two," he also "made several assaults on [Plaintiff]," hitting him in the head, body, and groin with an open hand "no more than [ten times.]" (*Id.* at 100–02, 188.)[8] When Greiner hit Plaintiff in the groin, he leaned over Plaintiff's head and made a "hammer[-]type motion with his arm and fist," hitting him with the heel of his hand. (*Id.* at 102.) Plaintiff rated the pain from this specific action as a 12 out of ten. (*Id.* at 186.) Greiner also hit Plaintiff in the stomach "so hard [that he] almost threw up." (*Id.*) Plaintiff recalls the physical altercation lasting "no more than" two or three minutes. (*Id.* at 103.) He also remembers asking Reid for medical attention on the elevator, but Reid "just stood there and watched and didn't say [anything]." (*Id.* at 104.) Plaintiff asked Reid whether he was going to let Vasquez, Greiner, and Munro assault him, to which Reid responded, "I don't see nothing [sic]." (*Id.*)

Once the assault stopped, Defendants hit a button so that the elevator would start moving. (*Id.* at 103.) Plaintiff's nose and mouth were bleeding as a result. (*Id.*) Plaintiff thought that before they disembarked the elevator, one of the Defendants said something "along the lines of[,]

---

[8] In Plaintiff's Complaint, he states that Vasquez "punched [Plaintiff] in the face several times" and spit in his face, Greiner "punched [Plaintiff] in the body," and Munro "punched [Plaintiff] in the head, face, body, and groin areas." (Compl. 5.) According to the Complaint, although Reid "watched th[e] entire assault," he did not try to stop it and did not provide medical aid to Plaintiff. (*Id.*)

8

next time you're going to do what the fuck you're told to do[,] or this is going to happen again."
(*Id.* at 104.)

As a result of the incident, Plaintiff suffered a bloody nose, swelling, pain in his groin, stomach, and nose, multiple "severe" bruises, a black eye that he believes was caused by Vasquez and lasted for more than a week, and a sore ankle that made it difficult to walk and that hurt for approximately two weeks. (*Id.* at 111, 168, 186, 189.)[9, 10] Plaintiff rated the pain from the altercation to be at an eight or nine out of ten for "a couple [of] days afterwards" and added that he had visible swelling around his eye socket on the right side of his head that lasted for two to three days. (*Id.* at 170–71.) He recalled that he still had pain in his groin for at least "a couple [of] days after[ward]," but that the medication made it difficult to remember. (*Id.* at 190.) Plaintiff was "so high and medicated" that he could not recall whether his ankle was swollen but recalls that he asked MHFPC staff to take photos of the swelling, but they refused. (*Id.* at 111–12.) Plaintiff also remembered that before the elevator incident, he had a bruise on the back of his head, but because of the incident, he suffered from additional bruising on his face and head. (*Id.* at 172.) Although he did not remember which side, Plaintiff thought that he was bruised at the corner of his forehead. (*Id.* at 171.) According to Plaintiff, he did not suffer from bruising of his groin or stomach because Defendants knew that if they hit him in those areas, there would not be any bruising. (*Id.* at 187.) As a result of the elevator incident, Plaintiff experienced

---

[9] Plaintiff later testified that the black eye lasted for "[p]robably about two weeks" or "two and a half weeks or so." (*Id.* at 194.) He thought that "[o]ver a hundred" people probably saw him with the black eye during that period. (*Id.* at 195.)

[10] Plaintiff alleges in his Complaint that as a result of the assault, he suffered from "severe pain and swelling," bruising, scarring, a black eye, and a bloody nose. (Compl. 5–6.) Plaintiff also suffered from "emotional/mental duress, emotional/mental pain, [and] constant fear for [his] safety." (*Id.* at 6.)

"heightened anxiety." (*Id.* at 198.) Plaintiff also suffered from a "[c]onstant fear of being assaulted" by Defendants and felt "on edge" each time he tried to report the incident because he "was having constant fights with all of [the Defendants]," particularly Vasquez. (*Id.* at 112–13.)

### b. May 7, 2016 Aftermath

Once Plaintiff was off the elevator, "the medication really hit [him]," though he testified that he was also "out of it" during the elevator incident. (*Id.* at 178–79, 186.) He was taken to the quiet room, where he states that either his nose and/or mouth were bleeding and continued to "re-bleed[]" during the day. (*Id.* at 105, 167.)[11] Plaintiff tried to spit the blood in his mouth at Vasquez and had blood "crusted down around [his] face." (*Id.* at 169.) According to Plaintiff, "[e]veryone that was in th[e quiet] room" saw his bloody nose because "you couldn't miss it." (*Id.*) Plaintiff recalled someone asking why he was bleeding and instructing everybody in the room to get gloves. (*Id.*) A doctor and nurse were present in the quiet room while Plaintiff was there. (*Id.* at 170, 174.) Although the doctor "visibly looked at" Plaintiff, he did not speak to him. (*Id.* at 174.) However, according to Plaintiff, he was also evaluated by a doctor and a nurse "at the same time," presumably also in the quiet room. (*Id.* at 175.)

██████████████████████████████████████████████ Plaintiff testified that he was "so out of it" for three to five days. (*Id.* at 58–59, 178–79.)[12] Plaintiff was unable to eat, speak to a doctor, or report the incident in the elevator and the injuries he sustained as a result.

---

[11] Plaintiff testified that he was so "highly medicated" that he is not sure whether his nose was still "actively bleeding" by the night of May 7. (Pl.'s Dep. Tr. 168.)

[12] ██████████████████████████████████████████████
████████████████████████████████ █ █ ████████████
██████████████████████████████████████
██████████████ (Chukwuocha Decl. ¶ 20; *id.* Ex. B ("Chukwuocha May 7, 2016 Incident Report A"), at 1, 5 (Dkt. No. 99-2); *id.* Ex. C ("Chukwuocha May 7, 2016 Incident Report B"), at 1, 3 (Dkt. No. 99-3).)

(Defs.' 56.1 ¶¶ 52, 55, 58–59 (citing Pl.'s Dep. Tr. 106, 174, 181); Pl.'s Dep. Tr. 178.) Plaintiff also could not remember whether his ankle was swollen, for how long his nose was bleeding, and whether he was offered food. (Defs.' 56.1 ¶¶ 53–54, 56–57 (citing Pl.'s Dep. Tr. 106, 111, 167–68).)

"[W]ithin a day or two" of the elevator incident, Plaintiff was taken to Orange Regional Medical Center ("ORMC"). (Pl.'s Dep. Tr. 159–60.) Plaintiff attempted to report the incident to ORMC staff, but the SHTAs who accompanied Plaintiff from MHFPC refused to leave him alone. (*Id.* at 160–61, 178.) When Plaintiff tried to report the incident in the presence of the SHTAs, the SHTAs stated, "that's not what happened[, h]e got into an altercation with an inmate or with another patient." (*Id.* at 161.) Because Plaintiff remained "so out of it" during this stay, he was not able to fully argue this point and does not remember complaining about any specific physical pain to the ORMC staff, or to which ORMC staff he complained. (*Id.* at 178–80.) Plaintiff recalled having a psychiatric evaluation at ORMC because he "started coming around a little bit," but during the evaluation, he "could[ not] even keep [his] eyes open and talk to the psych[iatric] staff." (*Id.* at 180.) With respect to his injuries, Plaintiff recalled that "the bruises and everything w[ere] mentioned by . . . the doctors," but the SHTAs said that the injuries were from the other patient, although Plaintiff protested this explanation. (*Id.* at 181.) ████

████████████████████████

### c. Plaintiff's Reports

Plaintiff recalls that he "tried to make complaints to the facility" and "treatment team," which included a social worker named "Ms. Childs," a medical doctor, psychiatric doctor, and unit or ward manager who Plaintiff thinks was named "Smith." (*Id.* at 106–07.) Plaintiff asked the team whether he could use the phone or speak to "safety officers," but was told that he was

not allowed. (*Id.* at 107–08.) Plaintiff also recalls speaking to someone who may have been named "Ms. Christy" on the "administration staff," but that nothing resulted from the conversation. (*Id.* at 108.)[13] Plaintiff "felt on edge every day" because when he tried to report the incident, "he was having constant fights with all of [the Defendants]," and "every time [Plaintiff] tried to report . . . nothing got done." (*Id.* at 112–13.) According to Plaintiff, Defendants also filed a false report saying that the incident did not occur. (*Id.* at 197.)

Plaintiff is "sure" that he spoke to other patients about the incident and also showed other patients his claim for the "court of claims." (*Id.* at 109.) Between May 7, 2016 and June 13, 2016, he spoke to several patients and staff members, including ██████████ and one who was named ██████ (and, according to Plaintiff, is now named ██████) regarding the alleged incident in the elevator. (*Id.* at 109–10.) Plaintiff also showed his complaint to others on the treatment team before mailing it. (*Id.* at 110–11.)

### 4. Moving Defendants' Recitation of Facts

#### a. May 7, 2016 Incidents

On May 7, 2016 at approximately 4:22 p.m., Plaintiff got into a verbal and physical altercation with another patient with whom he had "personal issues" that "had been going on for days." (Defs.' 56.1 ¶¶ 25, 31 (citing Harvey Decl. ¶ 11; *id.* Ex. A ("Harvey May 7, 2016 Progress Note A") (Dkt. No. 101-1); Chukwuocha Decl. ¶ 19; Chukwuocha May 7, 2016

---

[13] Plaintiff did not state, nor was he asked, when his conversations with the "treatment team" and "administration staff" took place. He also stated that after he did not hear back from "administration staff," he "started typing up [his] court of claims claim." (Pl.'s Dep. Tr. 108.) Plaintiff subsequently filed the claim before this Court because he did not hear anything about his original claim. (*Id.*)

Later in the deposition, Plaintiff stated that he reported the incident to "[e]very staff member [he] could," including "[w]ard staff, treatment team, risk management, director, [and] safety officers." (*Id.* at 200.)

Incident Report A; Kouyoumdjian Decl. ¶ 12).) The instigating patient "threw a punch" and "began fighting" with Plaintiff and another patient with whom Plaintiff was sitting. (*Id.* ¶¶ 25–26 (citing Harvey Decl. ¶ 11; Harvey May 7, 2016 Progress Note A; Chukwuocha Decl. ¶ 19; Chukwuocha May 7, 2016 Incident Report A).) Shortly after the incident, Plaintiff informed Dr. Vahan Kouyoumdjian ("Kouyoumdjian") that he had been "punched . . . on the head." (Kouyoumdjian Decl. Ex. A ("Kouyoumdjian May 7, 2016 Progress Note A") (Dkt. No. 102-1).)

Between 4:25 p.m. and 4:45 p.m., Plaintiff was examined by RN Lydia Harvey ("Harvey"), (Harvey May 7, 2016 Progress Note A), and at 5:05 p.m., he was examined by Kouyoumdjian, (Kouyoumdjian Decl. ¶ 11; Kouyoumdjian May 7, 2016 Progress Note A).[14] As a result of the incident, Plaintiff suffered from shallow swelling, a "small abrasion on his right occipital area," and a headache with "pain level at a [six] out of [ten]." (Defs.' 56.1 ¶¶ 28–29 (citing Harvey Decl. ¶¶ 12–13; Harvey May 7, 2016 Progress Note A); Kouyoumdjian May 7, 2016 Progress Note A (stating that Plaintiff suffered a scratch and swelling on his "left occipital area").) ████████████████████████████████████████████
████████ (Defs.' 56.1 ¶¶ 29–30 (citing Harvey Decl. ¶ 13; Harvey May 7, 2016 Progress Note A); Harvey Decl. ¶ 14.)

Following the altercation, Kouyoumdjian wrote an order directing that Plaintiff should spend the weekend on "Ward 33/34 for his own safety" because the patient with whom he fought was on a "special watch," but Plaintiff refused to follow the order. (Defs.' 56.1 ¶¶ 32–33 (citing

---

[14] The exact time at which Plaintiff was examined by Harvey and Kouyoumdjian is unclear from the medical records submitted by Moving Defendants. According to a progress note authored by Harvey, Plaintiff was evaluated by an "MD," ████████████████████ ████████████████████████ (Harvey May 7, 2016 Progress Note A.) According to a progress note authored by Kouyoumdjian, however, Plaintiff was seen ████████████████ at 5:05 p.m. (Kouyoumdjian May 7, 2016 Progress Note A.)

Harvey Decl. ¶ 15; Harvey May 7, 2016 Progress Note A; Kouyoumdjian Decl. ¶ 15; Pl.'s Dep. Tr. 82–83; Reid Decl. ¶ 6).) At approximately 6:30 p.m. on May 7, Plaintiff was again informed that he needed to move to Ward 33/34 as he was "in the dayroom . . . grandstanding for his peers" and "boast[ing] that he was[] [not] moving from his area or his ward." (*Id.* ¶¶ 34–35 (citing Harvey Decl. ¶ 16; Harvey May 7, 2016 Progress Note A; Chukwuocha May 7, 2016 Incident Report B).) At 6:40 p.m., Kouyoumdjian was called to the day room when Plaintiff attempted to charge MHFPC staff. (*Id.* ¶¶ 36–37 (citing Harvey Decl. ¶ 17; Harvey May 7, 2016 Progress Note; Chukwuocha Decl. ¶ 20; Chukwuocha May 7, 2016 Incident Report B; Kouyoumdjian Decl. ¶ 17; *id.* Ex. B ("Kouyoumdjian May 7, 2016 Progress Note B") (Dkt. No. 102-2)); Kouyoumdjian Decl. ¶ 16.) At least two of the Moving Defendants were also present and attempted to deescalate the situation. (Munro Decl. ¶¶ 3–5; Greiner Decl. ¶¶ 3–5.) ██████

██████████████████████████████████████████████████████████

██████████████ (Defs.' 56.1 ¶ 37 (citing Harvey Decl. ¶ 17; Harvey May 7, 2016 Progress Note A; Kouyoumdjian Decl. ¶ 17; Kouyoumdjian May 7, 2016 Progress Note B).)[15] ██████

████████████████████████████████████████████████████ because he continued to try to fight by "kicking and stepping on staff's feet," causing the staff to "all [go] down to the ground." (*Id.* ¶¶ 38–39 (citing Kouyoumdjian Decl. ¶ 18; Kouyoumdjian May 7, 2016 Progress Note B; Reid Decl. ¶ 7; Munro Decl. ¶¶ 3, 5; Greiner Decl. ¶¶ 3, 5; Harvey Decl. ¶ 18; Harvey May 7, 2016 Progress Note A; Pl.'s Dep. Tr. 89); Chukwuocha May 7, 2016 Incident Report B 1.) ██████████████████████████

██████████████ , and afterward, he was counseled regarding the order that he move to

---

[15] ██████████████████████████ (Kouyoumdjian Decl. Ex. D ("Kouyoumdjian Physician Order Forms"), at 1–3 (Dkt. No. 102-4).) ██████████████ ██████████████ (*Id.*)

a different ward for the weekend. (Defs.' 56.1 ¶¶ 39–40 (citing Kouyoumdjian Decl. ¶ 18;

Kouyoumdjian May 7, 2016 Progress Note B; Harvey Decl. ¶ 18; Harvey May 7, 2016 Progress

Note A; Reid Decl. ¶ 7; Munro Decl. ¶ 5; Greiner Decl. ¶ 5; Pl.'s Dep. Tr. 89); Harvey Decl.

¶ 17.) Plaintiff remained angry and stated, "I am not going anywhere." (Defs.' 56.1 ¶ 41 (citing

Harvey Decl. ¶ 18; Harvey May 7, 2016 Progress Note A).)

b. May 7, 2016 Transfer

On May 7, 2016 at 7:20 p.m., Plaintiff was ███████████████████ put on

a stretcher, and transferred to Ward 33/34 one floor up via elevator by Reid, Vasquez, Greiner,

and Munro. (*Id.* ¶¶ 42–45 (citing Harvey Decl. ¶ 18; Harvey May 7, 2016 Progress Note A; Reid

Decl. ¶ 12; Munro Decl. ¶ 10; Greiner Decl. ¶ 10; Reid Decl. ¶¶ 8–9; Munro Decl. ¶¶ 6–7;

Greiner Decl. ¶¶ 6–7.)

The elevator ride lasted "less than 20 seconds," and Plaintiff was restrained on the

stretcher during the entire ride. (Defs.' 56.1 ¶¶ 46, 48 (citing Reid Decl. ¶¶ 10, 13–16; Munro

Decl. ¶¶ 8, 10–11; Greiner Decl. ¶¶ 8, 10; Hand Decl. ¶¶ 13, 15; *id.* Ex. A ("Hand May 7, 2016

Incident Report"), at 4–5 (Dkt. No. 100-1)).) According to Moving Defendants, Plaintiff "did

not require any interventions" on the elevator, and was not assaulted during the ride. (*Id.* ¶¶ 49–

50 (citing Reid Decl. ¶¶ 13–16; Munro Decl. ¶¶ 10, 11; Greiner Decl. ¶ 10; Hand Decl. ¶¶ 13,

15; Hand May 7, 2016 Incident Report 4–5).)

According to Moving Defendants, Plaintiff did not make any reports on May 7 to any

staff that he had been assaulted in the elevator. (*Id.* ¶ 74 (citing Hand Decl. ¶ 13; Hand May 7,

2016 Incident Report 4; Kouyoumdjian Decl. ¶¶ 24, 25; *id.* Exs. C ("Kouyoumdjian May 7, 2016

Progress Note C") (Dkt. No. 102-3), E ("Kouyoumdjian Special Observation Levels") (Dkt. No.

102-5); Kouyoumdjian May 7, 2016 Progress Notes A–B; Kouyoumdjian Physician Order

Forms; Harvey Decl. ¶¶ 22–23; *id.* Ex. B ("Harvey Special Observation Levels") (Dkt. No. 101-2); Harvey May 7, 2016 Progress Note A; Thomas Decl. ¶¶ 12–13; *id.* Exs. A ("Thomas May 7, 2016 Progress Note") (Dkt. No. 106-1), B ("Thomas Restraint Assessment") (Dkt. No. 106-2); Campbell Decl. ¶ 16; *id.* Ex. A ("Campbell May 7, 2016 Progress Note") (Dkt. No. 98-1)).)

At approximately 7:25 p.m., Plaintiff arrived on Ward 33/34. (Thomas Decl. ¶ 8.) Once on the Ward, Plaintiff "began kicking violently and spitting at staff." (Defs.' 56.1 ¶ 60 (citing Campbell Decl. ¶ 11; *id.* Ex. B ("Campbell May 7, 2016 Incident Report") (Dkt. No. 98-2); Campbell May 7, 2016 Progress Note; Hand Decl. ¶ 6; Hand May 7, 2016 Incident Report 1).) As a result of Plaintiff's kicking, the stretcher flipped, and the SHTAs who were present fell onto the stretcher and the floor. (*Id.* ¶ 62 (citing Campbell Decl. ¶¶ 11–12; Campbell May 7, 2016 Incident Report; Thomas Decl. ¶ 9; Thomas May 7, 2016 Progress Note; Kouyoumdjian Decl. ¶ 20; Kouyoumdjian May 7, 2016 Progress Note C; Hand Decl. ¶ 6; Hand May 7, 2016 Incident Report 1).) Plaintiff was placed in a chair in the "quiet room," which is "used to help isolate patients who pose a potential danger to themselves or others," but continued to kick, spit on, and threaten to assault the SHTAs and medical staff. (*Id.* ¶¶ 61, 63–65 (citing Campbell Decl. ¶¶ 10, 13–14; Campbell May 7, 2016 Incident Report; Thomas Decl. ¶ 10; Thomas May 7, 2016 Progress Note).) Plaintiff also refused any emergency medication and "nursing interventions" from the RN. (*Id.* ¶¶ 66–67 (citing Campbell Decl. ¶ 14; Campbell May 7, 2016 Incident Report; Thomas Decl. ¶ 10; Thomas May 7, 2016 Progress Note).) When Plaintiff tried to charge the SHTAs and medical staff, he was placed back in the chair, ███████████████ ████████████████████████████████████ ("Thomas"). (*Id.* ¶¶ 68–69 (citing Campbell Dec. ¶ 14; Campbell May 7, 2016 Incident Report; Kouyoumdjian Decl. ¶ 21; Kouyoumdjian May 7, 2016 Progress Note C; Thomas Decl. ¶ 11; Thomas May 7, 2016

Progress Note).) At this time, Plaintiff did not complain of the alleged assault or any injuries. (Kouyoumdjian Decl. ¶ 24.) Thomas reported "no visible signs of injury" besides a "scant amount of nasal bleeding and a small abrasion to the back of his right ear." (Defs.' 56.1 ¶ 72 (citing Thomas Decl. ¶ 9; Thomas May 7, 2016 Progress Notes; Hand Decl. ¶ 7; Hand May 7, 2016 Incident Report 2).) SHTA Edward Campbell ("Campbell"), who was also in the quiet room, noticed no "excessive bleeding, bruising, or a black eye." (Campbell Decl. ¶ 16.)

Kouyoumdjian again examined Plaintiff at 7:35 p.m. that evening and determined that he had a "superficial scratch and a small abrasion" to the back of his right ear, as well as an injury to his nose with "scant amount of bleeding." (Defs.' 56.1 ¶¶ 70–71 (citing Kouyoumdjian Decl. ¶¶ 20, 22; Kouyoumdjian May 7, 2016 Progress Note C); Hand Decl. ¶ 14.)[16] Kouyoumdjian attributed these injuries to the flipped stretcher. (Kouyoumdjian Decl. ¶ 20.) Plaintiff refused treatment at this time and did not complaint of pain or report that he had been assaulted in the elevator. (Hand Decl. ¶ 14; Hand May 7, 2016 Incident Report 2, 4; Kouyoumdjian Decl. ¶ 22.) Approximately an hour later, at 8:30 p.m., ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Plaintiff because he "continued to make threats and was uncooperative." (*Id.* ¶ 23.) Plaintiff again did not allege that he had been assaulted, nor did he complain of any injuries. (*Id.* ¶ 24.)

### c. May 8, 2016 Incident

On the following day, Plaintiff remained on "one-to-one supervision," with an MHFPC staff member "within arm's reach of him . . . at all times." (Defs.' 56.1 ¶¶ 75–76 (citing Harvey Decl. ¶ 19).) Plaintiff refused to eat, drink, follow instructions, or respond for most of the day,

---

[16] Kouyoumdjian states that he was both "called . . . to respond to an emergency involving [Plaintiff]" at 7:35 p.m. and that he examined Plaintiff at 7:35 p.m. (Kouyoumdjian Decl. ¶¶ 19, 22.)

and between 4:00 p.m. and 4:20 p.m., he began to kick staff members while an SHTA and RN were taking his vital signs. (*Id.* ¶¶ 77–79 (citing Harvey Decl. ¶¶ 20–21; *id.* Exs. C ("Harvey May 8, 2016 Progress Note A") (Dkt. No. 101-3), E ("Harvey Restraint Assessment") (Dkt. No. 101-5); Chukwuocha Decl. ¶ 21; *id.* Ex. D ("Chukwuocha May 8, 2016 Incident Report A") (Dkt. No. 99-4)).) ███████████████████████████

███████ (*Id.* ¶ 80 (citing Harvey Decl. ¶ 21; Harvey May 8, 2016 Progress Note A; Harvey Restraint Assessment; Chukwuocha Decl. ¶ 21; Chukwuocha May 8, 2016 Incident Report A); Chukwuocha Decl. Ex. E ("Chukwuocha Physician Order Form") (Dkt. No. 99-5).) ████████

█████████████████████████████████████████████

█████████████████████████████ (Defs.' 56.1 ¶¶ 81–82 (citing Harvey Decl. ¶¶ 19, 22; Harvey Special Observation Levels; Harvey May 8, 2016 Progress Note A; Harvey Restraint Assessment).) ████████████████

█████████████████████████████████████████████

██████ (*Id.* ¶¶ 83–84 (citing Harvey Decl. ¶ 24; *id.* Ex. D ("Harvey May 8, 2016 Progress Note B") (Dkt. No. 101-4)); Chukwuocha Physician Order Form 1.) At both 4:20 p.m. and 5:20 p.m., Plaintiff "did not have any injuries, nor did he report any injuries from the day before." (Defs.' 56.1 ¶¶ 82, 84 (citing Harvey Decl. ¶ 22; Harvey May 8, 2016 Progress Notes A–B; Harvey Restraint Assessment).) Harvey "did not notice any bleeding, bruising, or black eye[s]." (Harvey Decl. ¶ 22.) ███████████████████████ (Harvey May 8, 2016 Progress Note A 1; Chukwuocha Physician Order Form 2), and at 6:00 p.m., Chukwuocha again noted "[n]o physical injuries," (Chukwuocha May 8, 2016 Incident Report A 2).

Soon after, Choudry ██████████████████████████████

█████████████████████████████████." (Defs.' 56.1

¶ 85 (citing Harvey Decl. ¶ 25; Harvey May 8, 2016 Progress Note B).) ████████████
██████████████████████, put in handcuffs and sent in an ambulance to ORMC. (*Id.*
¶¶ 86–88 (citing Harvey Decl. ¶ 26; Harvey May 8, 2016 Progress Note B).) Plaintiff was

handcuffed because he "remained non-compliant and combative." (*Id.* ¶ 87 (citing Harvey Decl.

¶ 26; Harvey May 8, 2016 Progress Note B).)

### d. May 8, 2016 ORMC Examinations

At 6:29 p.m. on May 8, Plaintiff was admitted to ORMC's Emergency Department. (*Id.*

¶ 89 (citing Sansolo Decl. Ex. E ("ORMC Medical Records"), at 2 (Dkt. No. 105-5)).) RN

Catriona Fraser ("Fraser") tried to conduct a pain assessment at 6:41 p.m., but was unable to do

so because Plaintiff refused to speak. (*Id.* ¶¶ 90–91 (citing ORMC Medical Records 29).) At

7:14 p.m., Plaintiff told a physician that he was "refusing food or fluids because he was sedated

by jail staff [on the previous day], and he d[id] not want anything to eat or drink at the moment."

(*Id.* ¶ 92 (citing ORMC Medical Records 4).) He also told the physician that he "need[ed] to

urinate" and that he had "suprapubic pain, describe[d] as a pressure secondary to needing to

urinate." (*Id.* ¶ 93 (citing ORMC Medical Records 4).) Plaintiff did not have "any nausea,

vomiting, diarrhea, headache, chest pain, dizziness, numbness/tingling, coughing, fever/chills,

vison changes, [or] focal neurological weakness," and also did not suffer from "testicular/scrotal

pain." (*Id.* ¶¶ 94–95 (citing ORMC Medical Records 4).)

At 7:34 p.m., Plaintiff received a physical from Michelle Fowler, "DO" ("Fowler"). (*Id.*

¶ 96 (citing ORMC Medical Records 5).) Fowler noted that Plaintiff had a "small superficial

abrasion on the right side of his upper lip." (*Id.* ¶ 97 (citing ORMC Medical Records 5).)

Otherwise, Fowler did not note any other injuries to Plaintiff's head, nor to his eyes, abdomen,

back, or extremities. (*Id.* ¶¶ 98–106 (citing ORMC Medical Records 5).) When Plaintiff was re-

evaluated at 7:35 p.m., Fowler documented that Plaintiff was able to urinate, his subrapubic pain was gone, and he had no other physical complaints. (*Id.* ¶¶ 107–10 (citing ORMC Medical Records 6).) At 9:35 p.m., Plaintiff again did not suffer from pain or discomfort, but did refuse to have his vital signs or blood taken by ORMC staff. (*Id.* ¶¶ 111–12 (citing ORMC Medical Records 9–10).)

At 10:36 p.m., when Jessica Cantave ("Cantave"), a licensed master social worker, conducted a "Trauma Risk Screen," ███████████████. (*Id.* ¶¶ 113–14 (citing ORMC Medical Records 30).) At 10:43 p.m., Dr. Quazi Al-Tariq ("Al-Tariq") performed a psychiatric consultation. (*Id.* ¶ 115 (citing ORMC Medical Records 23).) At 11:03 p.m., Plaintiff was discharged from ORMC to return to MHFPC. (*Id.* ¶ 122 (citing ORMC Medical Records 2).) ORMC staff recommended that Plaintiff remain on "one-to-one supervision" at MHFPC. (*Id.* ¶ 118 (citing ORMC Medical Records 23).)

Plaintiff was "aggressive, hostile, verbally abusive, . . . impulsive[,] and unpredictable" and "curs[ed] for no reason" while at ORMC. (*Id.* ¶¶ 116–17 (citing ORMC Medical Records 23).) According to Moving Defendants, Plaintiff did not report any physical injuries or assaults to ORMC staff, and ORMC staff did not note any physical injuries to Plaintiff during his treatment. (*Id.* ¶¶ 118–20 (citing ORMC Medical Records 23).)

Plaintiff returned to MHFPC at 11:15 p.m. in stable condition and was permitted to return to Ward 31/32 with his doctor's approval. (*Id.* ¶¶ 123, 126 (citing Malfa Decl. ¶ 7; *id.* Ex. A ("Malfa May 9, 2016 Progress Note") (Dkt. No. 103-1)).)[17] Plaintiff was assessed by RN

---

[17] RN Madelyn Malfa states that Plaintiff returned to MHFPC at 11:15 p.m. on May 9, 2016. (Malfa Decl. ¶ 7.) The accompanying progress note, however, was signed by Malfa on May 9 at 2:34 a.m., and states that Plaintiff arrived at 11:15 p.m. (Malfa May 9, 2016 Progress Note 1.) Thus, Plaintiff appears to have arrived at MHFPC shortly before midnight on May 8, 2016.

Madelyn Malfa ("Malfa"), who determined that Plaintiff "showed no indication of any injuries," did not complaint of any pain, refused vital signs and a pain assessment, and did not allege that he had been assaulted on the previous day. (*Id.* ¶¶ 124–25 (citing Malfa Decl. ¶¶ 8–9; Malfa May 9, 2016 Progress Note; McKenzie Decl. ¶¶ 7–8; *id.* Ex. A ("McKenzie May 9, 2016 Progress Note") (Dkt. No. 104-1)).) Malfa did not notice "any bleeding, bruising, or black eye[s]." (Malfa Decl. ¶ 8.) Similarly, RN Tiffany McKenzie ("McKenzie") assessed Plaintiff when he returned to his MHFPC unit at approximately 12:47 a.m. (McKenzie Decl. ¶ 6.) Plaintiff again refused to have his vital signs checked and refused pain and "Morse Fall" assessments. (*Id.* ¶ 7.) Plaintiff did not complain of pain or the alleged assault, and McKenzie "noted no injuries," including "bleeding, bruising, or black eye[s]." (*Id.* ¶¶ 8–9.)

### e. May 9, 2016 Allegations

On the morning of May 9, Plaintiff reported to his "treatment team" that he had been assaulted while in the elevator from Ward 31/32 to Ward 33/34. (Defs.' 56.1 ¶ 127 (citing Hand Decl. ¶ 8; Hand May 7, 2016 Incident Report 4); Chukwuocha Decl. ¶ 22; *id.* Ex. F ("Chukwuocha May 8, 2016 Incident Report B"), at 2 (Dkt. No. 99-6)).)[18] Plaintiff was examined by Chukwuocha at 10:05 a.m., who reported that Plaintiff had a bruise and "contusion of the left peri-orbital region." (Defs.' 56.1 ¶¶ 128–29 (citing Hand Decl. ¶ 10; Hand May 7, 2016 Incident Report 9; Chukwuocha Decl. ¶ 22; Chukwuocha May 8, 2016 Incident Report B).) According to Chukwuocha, these injuries were "slight" and consistent with those that Plaintiff sustained on May 7 during his altercation with another prisoner and the flipping of his stretcher;

---

[18] According to the report written by MHFPC Director of Risk Management Paul Hand ("Hand"), Plaintiff reported the alleged assault on May 8, 2016. (Hand May 7, 2016 Incident Report 4.) However, the incident report attached by Hand indicates that the report was made on May 9, 2016. (*Id.* at 5.)

Chukwuocha saw no other injuries "consistent with [Plaintiff's] allegation that he had been assaulted by [MHFPC] staff two days prior." (*Id.* ¶ 130 (citing Chukwuocha Decl. ¶ 23; Chukwuocha May 8, 2016 Incident Report B); Chukwuocha Decl. ¶ 24.) RN Marisa Ruiz ("Ruiz") also examined Plaintiff, reporting that he had "injuries on his face" and a "bruise on eye" from the May 7, 2016 fight with another prisoner. (Defs.' 56.1 ¶¶ 131–32 (citing Hand Decl. ¶ 11; Hand May 7, 2016 Incident Report 10); Chukwuocha May 8, 2016 Incident Report B 5.)

MHFPC's Risk Management Department ("Risk Management") investigated Plaintiff's allegations. (Defs.' 56.1 ¶ 133 (citing Hand Decl. ¶ 13; Hand May 7, 2016 Incident Report 4; Reid Decl. ¶ 15).) Risk Management spoke to Kouyoumdjian, Reid, Thomas, and Harvey, and reviewed Kouyoumdjian's May 7, 2016 examination notes during the course of its investigation. (*Id.* ¶¶ 133–37 (citing Hand Decl. ¶ 13; Hand May 7, 2016 Incident Report 4; Reid Decl. ¶ 15; Harvey Decl. ¶¶ 22–23; Harvey May 7, 2016 Progress Note A; Harvey Special Observation Levels; Harvey May 8, 2016 Progress Note A; Harvey May 8, 2016 Progress Note B; Harvey Restraint Assessment; Thomas Decl. ¶¶ 12–13; Thomas May 7, 2016 Progress Notes; Thomas Restraint Assessment).) During the investigation, Reid stated that Plaintiff had not been assaulted during the elevator transport. (*Id.* ¶ 134 (citing Hand Decl. ¶ 13; Hand May 7, 2016 Incident Report 4; Reid Decl. ¶ 15).) Thomas, Harvey, and Kouyoumdjian stated that Plaintiff did not allege that he had been assaulted or abused when they assessed him on May 7, 2016 following the elevator transfer. (*Id.* ¶¶ 136, 138 (citing Hand Decl. ¶ 13; Hand May 7, 2016 Incident Report 4; Harvey Decl. ¶¶ 22–23; Harvey May 7, 2016 Progress Notes A; Harvey Special Observation Levels; Harvey May 8, 2016 Progress Notes A–B; Harvey Restraint Assessment; Thomas Decl. ¶¶ 12–13; Thomas May 7, 2016 Progress Notes; Thomas Restraint

Assessment).) Kouyoumdjian further noted that Plaintiff had an abrasion near his right ear, a nose injury "with scant amount of bleeding," and that Plaintiff had refused treatment at the time. (*Id.* ¶¶ 139–40 (citing Hand Decl. ¶ 14; Hand May 7, 2016 Incident Report).)

On June 21, 2016, after completing the investigation, MHFPC's Incident Review Committee concluded that "there was no evidence to support Plaintiff's claims" that he was assaulted by Defendants on May 7, 2016, during the elevator transfer to Ward 33/34. (*Id.* ¶ 141 (citing Hand Decl. ¶ 15; Hand May 7, 2016 Incident Report 4–5).)[19]

### B. Procedural History

Plaintiff filed his Complaint on June 27, 2017, while incarcerated at Great Meadow Correctional Facility. (*See* Dkt. No. 2.) The Court granted Plaintiff's request to proceed in forma pauperis ("IFP") on July 20, 2017. (Dkt. No. 6.) On August 3, 2017, the Court issued an Order of Service directing service on Defendants. (Dkt. No. 8.)

Moving Defendants filed a Motion To Dismiss the Complaint and Revoke Plaintiff's IFP Status ("Motion To Dismiss") on November 8, 2017. (Moving Defs.' Not. of Mot. To Dismiss; Moving Defs.' Mem. of Law in Supp. of Mot. To Dismiss; Decl. of Adam J. Sansolo, Esq. in Supp. of Mot. To Dismiss (Dkt. Nos. 26–28).) After receiving an extension from the Court due to mailing issues, Plaintiff filed an Opposition to the Motion To Dismiss on April 20, 2018. (Pl.'s Opp'n to Mot. To Dismiss (Dkt. No. 34).) Moving Defendants did not file a reply.

On September 4, 2018, the Court denied Moving Defendants' Motion to Dismiss and gave them leave to file an answer within 30 days of the date of the Opinion. (Dkt. No. 38.) Moving Defendants filed their Answer on October 2, 2018, and Defendant Vasquez filed his

---

[19] Plaintiff also alleges a separate assault by only Vasquez on a later date. Given that Vasquez has not joined the instant Motion or filed a motion of his own, the Court will not address these allegations here.

Answer on October 4, 2018. (Dkt. Nos. 41–42, 44.)  The Court adopted a discovery schedule on October 17, 2018, (Dkt. No. 45), and referred the case to Magistrate Judge Judith McCarthy ("Judge McCarthy") on October 18, 2018 for general pretrial matters, (Dkt. No. 46).

On April 29, 2019, Moving Defendants requested leave to file a motion for summary judgment. (Dkt. No. 69.)  The Court granted the request and ordered that Moving Defendants file any such motion by June 21, 2019, Plaintiff submit a response by July 22, 2019, and Moving Defendants file a reply by August 16, 2019.  (Dkt. No. 72.)  After receiving an extension and permission to publicly file a redacted version of the Motion two weeks after filing it under seal, Moving Defendants filed the instant Motion under seal on July 31, 2019, (Dkt. Nos. 87–88), and publicly filed a redacted version on August 9, 2019, (Not. of Mot.; Moving Defs.' Mem. in Support of Mot. ("Defs.' Mem.") (Dkt. No. 92); Defs.' 56.1; Reid Decl.; Munro Decl.; Greiner Decl.; Campbell Decl.; Chukwuocha Decl.; Hand Decl.; Harvey Decl.; Kouyoumdjian Decl.; Malfa Decl.; McKenzie Decl.; Sansolo Decl.; Thomas Decl).  Moving Defendants also sent the requisite Rule 56.2 Notice to Plaintiff. (Dkt. No. 93.)  Plaintiff submitted no response after the Motion was filed, and Moving Defendants submitted no reply.  Thus, the Court now deems the Motion fully submitted.

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all

ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653

F.3d 156, 164 (2d Cir. 2011) (quotation marks omitted); *see also Borough of Upper Saddle River*

*v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same). "It is the

movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800*

*Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Berry v. Marchinkowski*, 137 F. Supp.

3d 495, 521 (S.D.N.Y. 2015) (same).

"However, when the burden of proof at trial would fall on the nonmoving party, it

ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an

essential element of the nonmovant's claim," in which case "the nonmoving party must come

forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to

avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114,

123 (2d Cir. 2013) (alteration and quotation marks omitted). Further, "[t]o survive a [summary

judgment] motion . . ., [a nonmovant] need[s] to create more than a 'metaphysical' possibility

that his allegations were correct; he need[s] to 'come forward with specific facts showing that

there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012)

(emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings,"

*Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks

omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for

summary judgment is properly supported by documents or other evidentiary materials, the party

opposing summary judgment may not merely rest on the allegations or denials of his pleading

. . . ."). And, "[w]hen opposing parties tell two different stories, one of which is blatantly

contradicted by the record, so that no reasonable jury could believe it, a court should not adopt

that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (quotation marks omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). However, a district court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'" *DiStiso*, 691 F.3d at 230 (quoting Fed. R. Civ. P. 56(c)(4)).

As a general rule, "district courts may not weigh evidence or assess the credibility of witnesses at the summary judgment stage." *Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d Cir. 2005); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (noting that at the summary judgment stage, the court is not to "weigh the evidence and determine the truth of the matter"); *Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 622 (2d Cir. 1999) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." (quotation marks omitted)). Where the evidence presents "a question of 'he said, she said'" the court "cannot . . . take a side at the summary judgment stage."

*Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010); *see also Kassel v. City of Middletown*, 272 F. Supp. 3d 516, 535 (S.D.N.Y. 2017) (noting that "it is not the role of the [c]ourt at summary judgment to resolve [a] factual clash"); *Bale v. Nastasi*, 982 F. Supp. 2d 250, 258–59 (S.D.N.Y. 2013) (stating that "[w]here each side . . . tells a story that is at least plausible and would allow a jury to find in its favor, it is for the jury to make the credibility determinations and apportion liability, and not for the court."). And, even if the non-movant's evidence is "thin, [a non-movant's] own sworn statement is adequate to counter summary judgment." *Scott v. Coughlin*, 344 F.3d 282, 290–91 (2d Cir. 2003) (holding that "[t]he credibility of [Plaintiff's] statements and the weight of contradictory evidence may only be evaluated by a finder of fact.").

Finally, the Second Circuit has instructed that when a court considers a motion for summary judgment, "special solicitude" should be afforded a pro se litigant, *see Graham*, 848 F.2d at 344; *accord Mercado v. Div. of N.Y. State Police*, No. 96-CV-235, 2001 WL 563741, at *7 (S.D.N.Y. May 24, 2001) (same), and a court should construe "the submissions of a pro se litigant . . . liberally" and interpret them "to raise the strongest arguments that they suggest," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (italics and quotation marks omitted). Moreover, "the failure to oppose a motion for summary judgment alone does not justify the granting of summary judgment." *Vt. Teddy Bear Co.*, 373 F.3d at 244; *see also Jackson v. Fed. Exp.*, 766 F.3d 189, 196 (2d Cir. 2014) (explaining that "an examination of the legal validity of an entry of summary judgment should . . . be[] made in light of the opposing party's pro se status" (italics omitted)). "Nonetheless, proceeding pro se does not otherwise relieve a litigant of the usual requirements of summary judgment, and a pro se party's bald assertions unsupported by evidence . . . are insufficient to overcome a motion for summary

judgment." *Houston v. Teamsters Local 210, Affiliated Health & Ins. Fund-Vacation Fringe Ben. Fund*, 27 F. Supp. 3d 346, 351 (E.D.N.Y. 2014) (alterations, italics, and quotation marks omitted); *see also Flores v. City of New York*, No. 15-CV-2903, 2017 WL 3263147, at *2 (S.D.N.Y. July 31, 2017) (same).

### B. Analysis

#### 1. Material Questions of Fact

There is an inherent dispute of fact before the Court—whether Moving Defendants assaulted Plaintiff, or failed to intervene in his assault, on the elevator. Moving Defendants argue that there is no *genuine* issue of material fact because Plaintiff's allegations are so inconsistent and uncorroborated that no reasonable person could believe Plaintiff's testimony. Moving Defendants thus seek summary judgment as to Plaintiff's claims of excessive force, failure to intervene, and deliberate indifference to medical needs. (Defs.' Mem. 12–20, 21 n.5, 22–23.)

At the summary judgment stage, "it is undoubtedly the duty of district courts not to weigh the credibility of the parties." *Jeffreys*, 426 F.3d at 554. Even when a plaintiff has relied exclusively on his own testimony, courts have denied summary judgment to defendants, as long as the plaintiff's "testimony was not contradictory or rife with inconsistencies such that it was facially implausible." *Fincher*, 604 F.3d at 726; *see also Bridgewater v. Taylor*, No. 08-CV-3593, 2011 WL 6762931, at *5 (S.D.N.Y. Dec. 21, 2011) (denying summary judgment where the plaintiff's evidence consisted "solely of his own testimony," but this testimony offered "a plausible alternate version of events"); *Butler v. Gonzalez*, No. 09-CV-1916, 2010 WL 3398156, at *8 (S.D.N.Y. May 18, 2010) (denying summary judgment where, although the plaintiff's evidence was "minimal," and his allegations "suffer[ed] from a lack of corroboration," there

were no "material inconsistencies" in plaintiff's account), *adopted by* 2010 WL 3398150 (S.D.N.Y. Aug. 26, 2010); *Sash v. United States*, 674 F. Supp. 2d 531, 541–42 (S.D.N.Y. 2009) (denying summary judgment because the court did not find plaintiff's "version of events to be so incredible, or in such discord with other evidence, as to find his allegations 'wholly fanciful,'" where plaintiff's claim relied "almost entirely" on his own, consistent, testimony (citation omitted)). Indeed, courts have denied summary judgment to defendants even where a plaintiff's version of the events is contradicted by substantial evidence. *See, e.g., Scott*, 344 F.3d at 289–91 (holding that "[a]lthough [the plaintiff's] evidence may be thin, his own sworn statement is adequate to counter summary judgment" and that "[b]y finding against [the plaintiff] on the basis of the disparity between some of [the plaintiff's] medical records and statements in his affidavit, the district court made an impermissible credibility determination and weighed contradictory proof . . . [which] may only be evaluated by a finder of fact" (citation omitted)); *Vital*, 168 F.3d at 622 ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." (citation omitted)); *Archer v. Dutcher*, 733 F.2d 14, 16 (2d Cir. 1984) (reversing grant of summary judgment and noting that "[i]t appears from the affidavits filed by appellees that [the plaintiff's] case may well be without merit . . . . Nonetheless, [the plaintiff's] affidavit in opposition to the motion for summary judgment does raise material factual disputes, irrespective of their likely resolution."); *cf. DeBlasio v. Rock*, No. 09-CV-1077, 2011 WL 4478515, at *13 (N.D.N.Y. Sept. 26, 2011) (partially denying summary judgment where the plaintiff relied exclusively on his own testimony, which was contradicted by evidence produced by the defendants, because the plaintiff's complaint and deposition testimony were "moderately contradictory," but "far less contradictory" than the testimony at issue in decisions granting summary judgment); *Bennett v.*

*Falcone*, No. 05-CV-1358, 2009 WL 816830, at *5 (S.D.N.Y. Mar. 25, 2009) (partially denying summary judgment where the plaintiff's story was "certainly inconsistent with other evidence and [was] subject to serious question," but was "not so blatantly false that the [c]ourt may simply reject it as a matter of law" (citation and quotation marks omitted)); *Rossi v. Stevens*, No. 04-CV-01836, 2008 WL 4452383, at *5–6 (S.D.N.Y. Sept. 30, 2008) (partially denying summary judgment where the defendants' testimony, third-party eyewitness testimony, and other evidence contradicted the plaintiff's uncorroborated version of events, because the plaintiff's story did not have any "fatal internal inconsistencies").

"While courts have granted summary judgment based on the incredulity of a plaintiff's testimony, they have done so sparingly." *Id.* at *6. Such a ruling is reserved "for the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete." *Fincher*, 604 F.3d at 725–26 (citation and quotation marks omitted); *see also Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 104–05 (2d Cir. 2011) ("Although a district court generally should not weigh evidence or assess the credibility of witnesses, . . . in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether the jury could reasonably find for the plaintiff, and thus whether there are any genuine issues of material fact, without making some assessment of the plaintiff's account." (citations, alterations, and quotation marks omitted)); *Jeffreys*, 426 F.3d at 555 (affirming grant of summary judgment where there was "nothing in the record to support plaintiff's allegations other than plaintiff's own contradictory and incomplete testimony"); *Butler*, 2010 WL 3398156, at *8 (noting that courts have granted summary judgment where there was "(1) a plaintiff whose own story was internally inconsistent and changed throughout the

proceedings; (2) substantial evidence undermining or directly refuting the plaintiff's version of events; and (3) defendants who submitted affidavits or declarations categorically denying the plaintiff's version of events" (citations omitted)). This exception is "very narrow" and at least one district in the Second Circuit has suggested that defendants seeking summary judgment under *Jeffreys* must satisfy a three-part test. *See Johnson v. Brown*, No. 09-CV-0002, 2010 WL 6243352, at *10 (N.D.N.Y. Sept. 3, 2010) ("In this district, . . . to qualify for application of the *Jeffreys* exception, a defendant must meet the following three requirements: [(1)] the plaintiff must rely almost exclusively on his own testimony; [(2)] the plaintiff's testimony must be contradictory or incomplete; and [(3)] the plaintiff's testimony must be contradicted by evidence produced by the defense." (citation and quotation marks omitted)), *adopted by* 2011 WL 1097864 (N.D.N.Y. Mar. 22, 2011).

Moving Defendants argue that Plaintiff's "meticulous step-by-step account" of what allegedly happened in the elevator is contradicted by his "self-described level of awareness" before and after the alleged incident. (Defs.' Mem. 14.) Moving Defendants also point to the fact that Plaintiff first raised the issue of his ankle injury during his deposition, and did not mention the injury in his Complaint or discovery responses. (*Id.* at 14–16; Compl. 6; Sansolo Decl. Ex. D ("Pl.'s Interrog. Resps.") (Dkt. No. 105-4); Pl.'s Dep. Tr. 98, 111, 177–78, 189.) However, the Court finds that neither of these inconsistencies is fatal. First, the dichotomy between Plaintiff's description of what happened in the elevator and his level of awareness during the alleged incident is not a contradiction, but instead a matter of credibility, which is not for this Court to determine. *See Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." (citation and quotation marks

31

omitted)). Indeed, Plaintiff has consistently alleged throughout this litigation that he was assaulted by Greiner, Vasquez, and Munro while Reid looked on and failed to intervene. (Compl. 5–6; Pl.'s Dep. Tr. 94–103.) Further, Plaintiff testified during his deposition that the medication "really hit [him]" once he was *off* the elevator. (*Id.* at 178.) This is a plausible explanation as to why Plaintiff may have been more lucid while he was on the elevator, particularly when, according to medical records, ███████████████████████████████ ███████████████████ shortly before Plaintiff rode the elevator at 7:00 p.m. (Kouyoumdjian Decl. ¶¶ 16, 18; Kouyoumdjian May 7, 2016 Progress Note B.) *See Burks v. Perrotta*, No. 13-CV-5879, 2015 WL 2340641, at *6 (S.D.N.Y. May 15, 2015) (determining that the plaintiff provided a plausible explanation for his inconsistent testimony when he stated that he was confused due to a head injury and the "circumstances of his interrogation").

Similarly, the fact that Plaintiff did not mention his alleged ankle injury until his deposition does not render his testimony "so incredible," particularly when in comparison to cases where summary judgment has been granted on such grounds. *Sash*, 674 F. Supp. 2d at 541 (citation omitted). For example, in *Jeffreys*, the Second Circuit found that the plaintiff's statement that he had been thrown out of a window by police officers was controverted by the fact that he had confessed to jumping out of the window himself without police involvement on three earlier occasions. *See* 426 F.3d at 551–52; *see also Brinson v. Kirby Forensic Psychiatric Ctr.*, No. 16-CV-1625, 2018 WL 4680021, at *9 (S.D.N.Y. Sept. 28, 2018) (finding that no reasonable person would credit the plaintiff's testimony when there was no corroborating medical evidence and the plaintiff's deposition testimony was "at odds with . . . the [p]laintiff's complaint"). Here, by contrast, Plaintiff's testimony is generally consistent with the allegations in the Complaint, (*see* Compl. 5–6), and his deposition testimony is not so internally inconsistent

as to meet the high bar in *Jeffreys*. Indeed, as recognized by Moving Defendants, Plaintiff's

recantation of the alleged elevator incident during his deposition was "meticulous" and "step-by-

step," (Defs.' Mem. 14), and his allegations of what occurred in the elevator, who was involved,

and the injuries he suffered are generally consistent with previous statements in this case,

(Compl. 5–6). Thus, Plaintiff's ankle injury allegation is not so inconsistent as to doom

Plaintiff's claim at this stage of the case. *See D'Attore v. N.Y.C. Dep't of Corr.*, No. 10-CV-815,

2012 WL 4493977, at *11 (S.D.N.Y. Sept. 27, 2012) (finding that although the plaintiff's

complaint and deposition testimony differed regarding the extent of his injuries, "such

exaggeration does not itself preclude a finding of liability, nor does it, by itself, justify entry of

summary judgment"), *adopted by* 2012 WL 5951317 (S.D.N.Y. Nov. 28, 2012); *cf. Aziz Zarif

Shabazz v. Pico*, 994 F. Supp. 460, 469–71 (S.D.N.Y. 1998) (granting the defendants' motion for

summary judgment because the plaintiff's allegations regarding his injuries had changed

"considerably" and "a number of times" over the course of the litigation, and because the

plaintiff had significantly revised portions of his allegations).

　　Although Plaintiff's testimony is not limited by excessive internal inconsistencies, it does

suffer from a lack of corroboration, particularly in light of the declarations and medical records

submitted by Moving Defendants. The lack of corroboration, however, is also not fatal to

Plaintiff's claims at this stage. District courts in the Second Circuit have granted summary

judgment on the basis of medical records when there is "direct[] and irrefutabl[e]

contradict[ion]" of a plaintiff's descriptions of his injuries, such that "no reasonable jury could

credit [a] plaintiff's account of the incident." *Henry v. Brown*, 406 F. Supp. 3d 211, 214

(E.D.N.Y. 2016) (citation and quotation marks omitted). For example, in *Henry*, where the

plaintiff alleged that he nearly lost his left leg and had a head injury so severe that he was

"unconscious lying in a pool of blood for approximately one hour and fifteen minutes," but the medical records documented only a scab on the plaintiff's leg and no head injury whatsoever, the court found that summary judgment was merited. *Id.* at 215; *see also Allah v. Wilson*, No. 13-CV-4269, 2017 WL 4350611, at *4 (S.D.N.Y. July 31, 2017) (finding that the plaintiff's medical records six days after an alleged beating revealed only a possible foot fungus); *Musaid v. Manka*, No. 13-CV-7880, 2016 WL 540806, at *5 (S.D.N.Y. Feb. 9, 2016) (finding that the plaintiff's contention that he suffered broken bones was belied by the evidence, which included x-rays showing no broken bones at all). Here, while a number of Plaintiff's alleged injuries do not appear in the medical records, or are seemingly more serious than those that do, not all of Plaintiff's allegations are "directly and irrefutably contradicted," *Henry*, 406 F. Supp. 3d at 214, by the record. For example, according to some of the records, Plaintiff did suffer from certain abrasions, bruises, and contusions, as well as a "scant amount of nasal bleeding" after he disembarked the elevator on May 7. (*See* Thomas Decl. ¶ 9; Thomas May 7, 2016 Progress Notes; Hand Decl. ¶¶ 7, 10, 14; Hand May 7, 2016 Incident Report 4, 9; Kouyoumdjian Decl. ¶ 20; Kouyoumdjian May 7, 2016 Progress Note C; ORMC Medical Records 5; Chukwuocha Decl. ¶¶ 22–23; Chukwuocha May 8, 2016 Incident Report B.)

Further, the medical records submitted by Moving Defendants do suffer from slight inconsistencies. For example, on May 7, Kouyoumdjian and Thomas noticed a "scant amount of nasal bleeding and a small abrasion to the back of [Plaintiff's] right ear." (Thomas Decl. ¶ 9; Thomas May 7, 2016 Progress Notes; Hand Decl. ¶¶ 7, 14; Hand May 7, 2016 Incident Report 4; Kouyoumdjian Decl. ¶¶ 20, 22; Kouyoumdjian May 7, 2016 Progress Note C.) When Plaintiff arrived at ORMC the next day, Fowler noted only a "small superficial abrasion on the right side of [Plaintiff's] upper lip," (ORMC Medical Records 5), and later that evening, Malfa and

McKenzie noticed no injuries, (Malfa Decl. ¶¶ 8–9; Malfa May 9, 2016 Progress Note; McKenzie Decl. ¶¶ 7–8; McKenzie May 9, 2016 Progress Note). The next morning, however, Chukwuocha noted a bruise and a "contusion of the left peri-orbital region," (Hand Decl. ¶ 10; Hand May 7, 2016 Incident Report 9; Chukwuocha Decl. ¶¶ 22–23; Chukwuocha May 8, 2016 Incident Report B), and Ruiz took note of "injuries on [Plaintiff's] face" and a bruise on his eye, (Hand Decl. ¶ 11; Hand May 7, 2016 Incident Report 10). *See Scott*, 344 F.3d at 289–90 (finding that the district court "made an impermissible credibility determination" when it found against the plaintiff, even though the plaintiff's "medical records d[id] not indicate that he suffered as much harm as his affidavit suggest[ed]" because the records were "inconclusive").

Plaintiff also alleges injuries that were not necessarily visible upon examination. For example, he alleges that Defendants punched him in the stomach and groin because they knew that bruises were not as visible in that area. (Pl.'s Dep. Tr. 187.) *See Baker v. German*, No. 15-CV-7296, 2019 WL 1382277, at *7 (S.D.N.Y. Mar. 27, 2019) ("[The d]efendants' argument rests on the proposition that the absence of mention of head or neck injury in the medical records . . . directly and irrefutably contradict[s] the allegations that [the p]laintiff was beaten over the head with a phonebook[,] [b]ut [the d]efendants have submitted no evidence establishing that theirs are the only reasonable inferences to draw from the relevant facts."); *D'Attore*, 2012 WL 4493977, at *12 (noting that it was unclear whether the term "[n]o apparent injuries" on a medical form referred to "anything other than visible injuries" and noting that the plaintiff testified to "intense pain at the time of the attack, and did not suggest that he suffered injuries that would have been visible on surface examination" (quotation marks omitted)). Additionally, although Plaintiff did not immediately complain about the pain or the alleged attack, he has alleged plausible reasons why he did not do so—that he was affected by and "so out of it" from

the emergency medication, that the MHFPC SHTAs who accompanied him to ORMC told ORMC staff that he had gotten into an altercation with a peer, and that he felt "on edge" each time he tried to report the assault. (Pl.'s Dep. Tr. 112–13, 178–81.) *See Kilmartin v. Schaffer*, No. 12-CV-1167, 2013 WL 5929447, at *6 (N.D.N.Y. Nov. 1, 2013) (noting that although the plaintiff did not immediately notify medical personnel of his injuries, he did "offer[] an explanation of why he failed" to do so, which was that he feared retaliation). These claims are also consistent with the medical records from ORMC. (ORMC Medical Records 2, 4, 8 ██████████████████████████████████████████████ "The patient states that he . . . was sedated by jail staff yesterday."; "[MHFPC] . . . reported [that] [patient] was involved in an altercation with another peer.").) Additionally, according to Moving Defendants, Plaintiff did report the alleged assault two days after it occurred. (Hand Decl. ¶ 8; Hand May 7, 2016 Incident Report 4; Chukwuocha Decl. ¶ 22; Chukwuocha May 8, 2016 Incident Report B 2.)

Thus, while Plaintiff's testimony is "certainly inconsistent with other evidence and is subject to serious question," it is "not so blatantly false that the Court may simply reject it as a matter of law." *Falcone*, 2009 WL 816830, at *5 (citation and quotation marks omitted). Nor is it so "contradictory or rife with inconsistencies such that it [is] facially implausible." *Fincher*, 604 F.3d at 726. Thus, for the Court to find for Moving Defendants now would require it to "ma[k]e an impermissible credibility determination and weigh[] contradictory proof." *Scott*, 344 F.3d at 289–90. However, "[w]hile the Court is not prepared to say that Plaintiff's version of events is internally inconsistent (at least in his deposition and written submissions to this Court) or hopelessly fanciful, it suffices to say his version of events will find little support, if any, in the record of this case . . . ." *Russo v. DiMilia*, 894 F. Supp. 2d 391, 413 (S.D.N.Y. 2012). "Indeed,

Plaintiff will have to defend his story under oath, and he faces all that comes with that responsibility." *Id.*

Moving Defendants' Motion with respect to Plaintiff's claims of excessive force and failure to intervene is therefore denied. Plaintiff's claim of inadequate medical treatment is discussed in further detail below.

### 2. Inadequate Medical Treatment

Moving Defendants argue that even if the Court were to accept Plaintiff's testimony about the alleged elevator incident, there is "insufficient evidence to create a genuine issue of fact" that Plaintiff received inadequate medical treatment. (Defs.' Mem. 21–24.) Moving Defendants indicate that "[t]he law is not fully settled with regard to which standard applies when a psychiatric patient asserts that he was denied adequate medical treatment while in custody at a state psychiatric hospital," pointing to both the "substantial departure" and "deliberate indifference" standards. (*Id.* at 21–22.) Moving Defendants argue, however, that under either standard, there is no genuine issue of material fact with respect to Plaintiff's treatment. (*Id.*)

At the time of the alleged incident, Plaintiff was a pre-trial detainee, committed to MHFPC for evaluation after pleading not responsible by reason of mental disease or defect to certain criminal charges. Thus, the Fourteenth Amendment applies to Plaintiff's claim of inadequate medical treatment. *See Lombardo v. Freebern*, No. 16-CV-7146, 2018 WL 1627274, at *2, 15 (S.D.N.Y. Mar. 30, 2018) (applying the same standard to a plaintiff committed to MHFPC after being adjudicated "not responsible for criminal conduct by reason of mental disease or defect" (citation and quotation marks omitted).)

The Supreme Court articulated the "substantial departure" standard in *Youngberg v. Romeo*, 457 U.S. 307 (1983), where the Court held that in the context of "involuntarily committed patients raising Fourteenth Amendment Due Process claims," *Muhammad v. New York City*, No. 15-CV-5603, 2016 WL 4367970, at *4 (S.D.N.Y. Aug. 12, 2016), a treatment decision is "presumptively valid[, and] liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment," *Youngberg*, 457 U.S. at 323 (footnote omitted); *see also Kulak v. City of New York*, 88 F.3d 63, 75 (2d Cir. 1996) ("[A] doctor will not be liable under §1983 for treatment decisions []he makes unless such decisions are such a substantial departure from accepted judgment, practice, or standards as to demonstrate that []he actually did not base the decision on such a judgment." (citations and quotation marks omitted).) "This standard requires more than simple negligence . . ., but less than deliberate indifference." *Young v. State of N.Y. Office of Mental Retardation and Dev. Disabilities*, 649 F. Supp. 2d 282, 289 (S.D.N.Y. 2009) (citation omitted).

District courts in the Second Circuit have noted that it is unclear whether the "deliberate indifference" or "substantial departure" standard applies to allegations such as Plaintiff's, where there is no alleged mental health treatment decision, but instead a claim of denial of medical treatment. *See Mejía v. N.Y.C. Health and Hosps. Corp.*, No. 16-CV-9706, 2018 WL 3442977, at *11 n.8 (S.D.N.Y. July 17, 2018) ("The Second Circuit has not indicated . . . whether an involuntarily committed plaintiff may bring a deliberate indifference claim, under the standard applicable to pretrial detainees, separate and apart from a claim under *Youngberg*'s substantial departure standard."); *Muhammad*, 2016 WL 4367970, at *4 (noting that "the case law is somewhat unclear as to what standard should apply to" a similar Fourteenth Amendment claim

but finding that under either standard, Plaintiff could demonstrate neither that his alleged injury "caused . . . substantial and chronic pain," nor could Plaintiff overcome the "presumption of validity" afforded to the doctor's determination that the condition did not require treatment (citation omitted)); *Dubose v. Boudreaux*, No. 12-CV-7633, 2014 U.S. Dist. LEXIS 123777, at *15–16 (S.D.N.Y. Aug. 20, 2014) (noting that while the law "is not entirely clear," the "substantial departure" test appeared to apply to the plaintiff's claims of forcible administration of psychiatric medication, and the "deliberate indifference" standard applied to the plaintiff's claim of inadequate dental and medical care, but applying both standards); *Inesti v. Hicks*, No. 11-CV-2596, 2012 WL 2362626, at *12–15 (S.D.N.Y. June 22, 2012) (applying the deliberate indifference standard under the Fourteenth Amendment to the plaintiff's claim of denial of treatment while hospitalized at psychiatric facilities), *adopted sub nom. Inesti v. Hagan*, 2012 WL 3822224 (S.D.N.Y. Sept. 4, 2012); *McNair v. Kirby Forensic Psychiatric Ctr.*, No. 09-CV-6660, 2010 WL 4446772, at *8–9 (S.D.N.Y. 2010) (applying the deliberate indifference standard to alleged withholding of heart medication, but the substantial departure standard to the plaintiff's complaints concerning his psychiatric treatment); *see also Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000) (applying the deliberate indifference standard to a pre-trial, non-psychiatric patient detainee's claims of denial of medical treatment); *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996) (same); *Kulak*, 88 F.3d at 754 (applying the *Youngberg* standard to psychiatric treatment decisions made by the defendants as to an involuntarily committed patient).

As with other district courts in the Second Circuit, the Court finds that it is unnecessary to reach the question of which standard applies here, because Plaintiff has failed to meet his burden under either. As noted, the substantial departure standard presumes that a medical professional's treatment decision is valid. Here, although Reid may well have failed to intervene

in or report the assault, Plaintiff has set forth no evidence that the medical treatment he received

after the alleged incident was a "substantial departure from accepted professional judgment,

practice, or standards." *Youngberg*, 457 U.S. at 314 (citation and footnote omitted); *see also*

*Brock v. City of New York*, No. 15-CV-1832, 2018 WL 3579099, at *10 (S.D.N.Y. July 25,

2018) ("The plaintiff bears the burden of producing evidence, typically in the form of expert

testimony, regarding applicable medical standards and the defendants' alleged failure to meet

those standards. . . . [S]ummary judgment is appropriate in the absence of such evidence."

(citations and quotation marks omitted)); *cf. Consention v. N.Y. Office of Mental Retardation and*

*Dev. Disabilities*, 354 F. App'x 466, 468 (2d Cir. 2009) (finding that the district court erred in

granting summary judgment when the plaintiff submitted a declaration from a psychiatrist stating

that the defendant's actions were a "substantial departure" from professional standards, and,

thus, there was a dispute as to what the minimum professional standard was). Indeed, Plaintiff

himself alleges that after disembarking the elevator, he was taken to a quiet room, where he was

evaluated by a doctor and nurse, and other professionals present acquired gloves because of

Plaintiff's bloody nose. (Pl.'s Dep. Tr. 175.)[20]

The medical records also demonstrate that at least one nurse and physician observed

and/or attempted to see Plaintiff promptly after he was taken off the elevator. Plaintiff arrived on

Ward 33/34 at 7:25 p.m., at which time Thomas reported "no visible signs of injury" besides a

"scant amount of blood from [Plaintiff's] nose and a small abrasion at the back of his ear."

(Thomas Decl. ¶¶ 8–9; Thomas May 7, 2016 Progress Notes.) Plaintiff refused any nursing

---

[20] While Plaintiff does state that a doctor in the quiet room "just looked at him," his testimony does not seem to allege that this amounted to a failure to provide medical care, particularly because he also states that "a doctor and the nurse [were] evaluating [him] at the same time." (Pl.'s Dep. Tr. 174–75.)

40

interventions at that time and did not allow Thomas to take his vital signs. (Thomas Decl. ¶ 10.)
Plaintiff was also examined by Kouyoumdjian at 7:35 p.m., ten minutes after his arrival on the
ward. (Defs.' 56.1 ¶¶ 70–71 (citing Kouyoumdjian Decl. ¶¶ 20, 22; Kouyoumdjian May 7, 2016
Progress Note C); Hand Decl. ¶ 14).) Kouyoumdjian determined that Plaintiff had "an abrasion
to his right ear and injury to his nose with scant amount of bleeding." (*Id.*) Plaintiff again
refused treatment at this time. (*Id.*; Hand May 7, 2016 Incident Report 2, 4; Kouyoumdjian
Decl. ¶ 22.) Approximately one hour later, at 8:40 p.m., Plaintiff was again in contact with
Kouyoumdjian, ███████████████████████ because Plaintiff "continued to make
threats and was uncooperative." (*Id.* ¶ 23.) Plaintiff once again did not complain of any injuries.
(*Id.* ¶ 24.) Further, Plaintiff remained under close one-on-one supervision the following day and
appears to have regularly been in contact with physicians and nurses. (*See* Harvey Decl. ¶¶ 19–
22; Harvey May 8, 2016 Progress Note A; Harvey May 8, 2016 Progress Note B; Harvey Special
Observation Levels; Chukwuocha Decl. ¶ 21; Chukwuocha May 8, 2016 Incident Report A.)

Based on the records of Plaintiff's treatment after his arrival on Ward 33/34, no
reasonable factfinder could determine that as a result of Reid's alleged failure to treat Plaintiff on
the elevator, there was a substantial departure from acceptable medical standards in Plaintiff's
treatment after the alleged incident, "especially in light of the medical documentation and
consistent testimony by [] employees." *Muhammad*, 2016 WL 4367970, at *4 (concluding that
the plaintiff's "conclusory statement that he thought he had internal bleeding" could not rebut the
presumption of validity afforded to a doctor's decision not to treat that condition, particularly
when the plaintiff did not provide any other evidence to support his claim); *see also Dubose*,
2014 U.S. Dist. LEXIS 123777, at *21–22 (finding that "no reasonable factfinder could
determine based on the evidence in the record that defendants substantially departed from

acceptable medical standards" when the plaintiff had to repeatedly request Motrin before receiving it and was "in pain for 75 minutes while being deprived of" the medication). Thus, even if Reid's inaction and failure to report the altercation did constitute a "substantial departure" from acceptable medical standards, Plaintiff was still promptly and consistently examined by doctors and physicians after arriving on Ward 33/34, and has set forth no evidence that such treatment was inadequate. Thus, Plaintiff was not prejudiced by Reid's inaction, and no constitutional violation occurred as a result. *See Lane v. Carpinello*, No. 07-CV-751, 2009 WL 3074344, at *21–22 (N.D.N.Y. Sept. 24, 2009) (finding that the plaintiff failed to demonstrate that "there was an unreasonable or deliberately indifferent 'denial' or delay in treatment" under both the deliberate indifference and substantial departure standards, even when the plaintiff alleged that one defendant ignored his request for help, because the plaintiff acknowledged that he did not report his injuries, did not complain of pain, did not request pain medication, and was later provided ibuprofen when requested); *cf. Geller v. Staten Island Dev. Ctr.*, No. 84-CV-354, 1991 WL 99054, at *13 (N.D.N.Y. June 5, 1991) (noting, in the context of a voluntarily committed plaintiff allegedly misdiagnosed as "profoundly retarded," that even if IQ tests administered by the defendants "represented a substantial departure from accepted professional judgment," summary judgment was still appropriate because "no constitutional deprivation occurred as a result of the administration of th[e] tests"; instead, the plaintiff received appropriate education, training, and other services).[21]

---

[21] Although Plaintiff's claim with respect to inadequate medical care does not survive, his claim against Reid for failure to intervene does. *See Yeldon v. Sawyer*, No. 10-CV-266, 2012 WL 1995839, at *7 (N.D.N.Y. Apr. 26, 2012), *adopted by* 2012 WL 1987134 (N.D.N.Y. June 4, 2012) (analyzing an involuntarily committed plaintiff's allegation that certain defendants, including at least one medical professional—an RN—stood outside of a room where the plaintiff was being assaulted by under staff members as a failure to protect claim).

On the other hand, to establish inadequate medical treatment under the Fourteenth Amendment, Plaintiff must demonstrate (1) "that he suffered a sufficiently serious constitutional deprivation," and (2) that the defendant "acted with deliberate indifference." *Tutora v. Correct Care Sols., LLC*, No. 17-CV-1969, 2019 WL 1383646, at *4 (S.D.N.Y. Mar. 27, 2019) (citation and quotation marks omitted). The first element is objective: the inmate must show that the "the alleged deprivation" is "sufficiently serious." *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (citation and quotation marks omitted). "In the medical care context, analyzing this objective requirement involves two inquiries: whether the prisoner was actually deprived of adequate medical care, and whether the inadequacy in medical care is sufficiently serious, which in turn requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Johnson v. Schiff*, No. 17-CV-8000, 2019 WL 4688542, at *11 (S.D.N.Y. Sept. 26, 2019) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 279–80 (2d Cir. 2006)) (quotation marks omitted). "There is no settled, precise metric to guide a court in its estimation of the seriousness of a prisoner's medical condition." *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003). Nevertheless, the Second Circuit has offered the following non-exhaustive list of factors to consider when evaluating an inmate's medical condition: "(1) whether a reasonable doctor or patient would perceive the medical need in question as important and worthy of comment or treatment, (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Id.* (citation and quotation marks omitted).

Under the second element, the inmate must show that the prison official "recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an

excessive risk to health or safety." *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017). An official's awareness of the risk of serious harm can be established through "inference from circumstantial evidence," including "from the very fact that the risk was obvious." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994). However, "mere negligence" is insufficient to state a claim for deliberate indifference. *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (quoting *Farmer*, 511 U.S. at 835). Neither does "mere disagreement over the proper treatment . . . create a constitutional claim"; "[s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to a[ ] [deliberate indifference] violation." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998).

Even assuming that Plaintiff was intentionally denied medical care such that the mental-state element would be satisfied, Plaintiff fails to allege facts plausibly suggesting that he suffered from an injury serious enough to satisfy the objective element. Viewing the alleged injuries in the light most favorable to Plaintiff, Plaintiff alleges that he was denied adequate medical treatment for the following conditions: (1) "multiple severe bruises," which he alleges were located on, inter alia, his forehead; (2) a black eye; (3) a bloody nose; (4) general "severe pain and swelling," including in his groin, stomach, and nose and swelling around his eye; and (5) a sore ankle that hurt for approximately two weeks. District courts in the Second Circuit have consistently held that bruises, lacerations, cuts, black eyes, and other superficial injuries are "not sufficiently serious to support" a deliberate indifference claim. *See Goodwin v. Kennedy*, No. 13-CV-1774, 2015 WL 1040663, at *12 (E.D.N.Y. Mar. 10, 2015) (holding that multiple cuts and lacerations did not satisfy the objective element); *Toliver v. City of New York*, No. 10-CV-5806, 2013 WL 6476791, at *5 (S.D.N.Y. Dec. 10, 2013) (holding that the plaintiff failed to satisfy the objective element when he alleged that he suffered from bruising, broken skin, a

44

bloody nose, and a swollen jaw), *adopted by* 2014 WL 549402 (S.D.N.Y. Feb. 11, 2014); *Rickett v. Orsino*, No. 10-CV-5152, 2013 WL 1176059, at *17 (S.D.N.Y. Feb. 20, 2013) (holding that "a split lip, which bled and became swollen . . . [and] needed stitches" did not constitute a serious medical condition (quotation marks omitted) (collecting cases)), *adopted by* 2013 WL 1155354 (S.D.N.Y. Mar. 21, 2013); *Dallio v. Hebert*, 678 F. Supp. 2d 35, 60 (N.D.N.Y. 2009) (holding that two black eyes, bruising in the kidney area, kick marks, open lacerations, headache, and numbness did not constitute a serious medical need as a matter of law). Plaintiff does not allege that any of his wounds became infected, or that he suffered ongoing problems or injuries. For all of Plaintiff's alleged injuries, he did not need stitches, and stated that the pain subsided after a couple of days to two weeks at the most. *See Rickett*, 2013 WL 1176059, at *17 (finding that split lip that healed a "few weeks" after the incident could not constitute a serious medical condition (quotation marks omitted)).

Although Plaintiff testified at his deposition that he suffered pain in his ankle, groin, stomach, and nose, (*see* Pl.'s Dep. Tr. 111), Plaintiff has not presented evidence to show that his pain constituted "a condition of urgency of the type that may produce death, degeneration, or extreme pain which correspondingly merits constitutional protection." *Gaines v. Okpok*, No. 03-CV-5095, 2006 WL 1652654, at *4 (E.D.N.Y. June 6, 2006) (citation and quotation marks omitted). "[S]ubjective complaints of pain" are not, in and of themselves, sufficient to establish the existence of a serious medical need. *Thomas v. Nassau Cty. Corr. Ctr.*, 288 F. Supp. 2d 333, 338 (E.D.N.Y. 2003). Further, with respect to his ankle, Plaintiff does not allege that anything was broken or sprained; indeed, he testified that although the injury made walking difficult, the pain resolved within two to three weeks. (*See* Pl.'s Dep. Tr. 166, 189.) *See Farray v. Green*, No. 12-CV-4717, 2013 WL 5676315, at *4 (E.D.N.Y. Oct. 16, 2013) (holding that a possible

sprained ankle "does not rise to the level of seriousness that the Eighth Amendment requires" (citation and quotation marks omitted)); *Johnson v. Kachelmeyer*, No. 03-CV-356, 2006 WL 625837, at *9 (W.D.N.Y. Mar. 9, 2006) (finding that several contusions and an ankle injury that caused pain, slight swelling, and difficulty bearing weight did not rise to the level of a "sufficiently serious" medical condition); *Warren v. Purcell*, No. 03-CV-8736, 2004 WL 1970642, at *8 (S.D.N.Y. Sept. 3, 2004) (finding that a swollen ankle and other ailments were not sufficiently serious to rise to the level of an Eighth Amendment violation). The fact that Plaintiff failed to inform multiple medical providers about his injuries, (*see* Defs.' 56.1 ¶¶ 74, 82, 84, 94–95, 107–11, 118–20, 124–25; Kouyoumdjian Decl. ¶¶ 22, 24; Hand Decl. ¶ 14; McKenzie Decl. ¶¶ 8–9; Pl.'s Dep. Tr. 106, 174, 178–80), also tends to show that his injuries were not "chronic." *See McClendon v. County of Nassau*, No. 11-CV-0190, 2012 WL 4849144, at *6 (E.D.N.Y. Oct. 11, 2012). Thus, summary judgment is granted with respect to Plaintiff's claim of inadequate medical treatment.

### III. Conclusion

For the foregoing reasons, the Court grants Moving Defendants' Motion for Summary Judgment with respect to Plaintiff's claim of inadequate medical treatment as to Reid, and denies the Motion with respect to Plaintiff's claims of excessive force and failure to intervene as to Greiner, Munro, and Reid. The Clerk of Court is respectfully directed to terminate the pending

Motion. (Dkt. No. 91.) The Court will hold a status conference on Monday, March 9, 2020 at

11:30 a.m.[22]

SO ORDERED.

DATED:     January 29, 2020
           White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

---

[22] Because unredacted versions of the Motion and accompanying Memorandum were filed under seal, the Parties may have two weeks from the date of this Opinion & Order (the "Opinion") to propose redactions to the Opinion before it is issued publicly.